IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**SHAW AND ASSOCIATES, INC.**, a New
Mexico corporation; and **JERRY SHAW AND
ASSOCIATES, INC.**, an Arizona corporation,

       Plaintiffs,

vs.                                                                            No. CIV 04-0123 WJ/DJS

**AMERICAN CONTRACTORS INDEMNITY
COMPANY**, a California corporation,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiffs' Third Application for an Order Compelling Discovery from Defendant American Contractors Indemnity Company (ACIC) and Motion for Sanctions **[Doc. No. 105]**, filed on September 7, 2005. On October 3, 2005, Defendant ACIC filed its Response in Opposition to Plaintiffs' Third Application for an Order Compelling Discovery and Motion for Sanctions **[Doc. No. 115]**. On October 18, 2005, Plaintiffs filed their Reply in Support of Plaintiffs' Third Application for an Order Compelling Discovery and Motion for Sanctions **[Doc. No. 120]**. On January 10, 2006, Plaintiffs filed a Supplemental Citation of Deposition Testimony Regarding Plaintiffs' Reply in Support of Third Application for an Order Compelling Discovery and Motion for Sanctions **[Doc. No. 149]**.[1] Plaintiffs move the

---

[1] The Court did not rely on Plaintiffs' January 10, 2006 Supplemental Citation of Deposition Testimony to reach its ruling.

Court for an order compelling ACIC to comply with Plaintiffs' Request for Production Nos. 38 and 57.

Plaintiffs contend that during the course of discovery, ACIC failed to disclose that its former President, Andy Faust, deleted emails from Skip Baumgarten's laptop computer. Thus, Plaintiffs conducted critical depositions, including Mr. Faust's deposition, without benefit of this vital information. Mr. Faust's action is significant when viewed in light of the facts presented by Plaintiffs.

**Factual Background**

Mr. Baumgarten is the founder and principal shareholder of ACIC and was its CEO until he suffered an incapacitating heart attack on July 15, 2001. Prior to his heart attack and, as CEO of ACIC, Skip Baumgarten maintained a close business and personal relationship with Jerry Shaw. *See* Holbrook Dep., Pls.' Reply, Ex B.[2] It is this close business relationship that led to

---

[2] James Holbrook, ACIC's Corporate Counsel at the time of Skip Baumgarten's heart attack, testified that Skip and Corby Baumgarten and Jerry Shaw and his wife were close, professionally and socially. In terms of the business relationship between ACIC and Plaintiffs, Mr. Holbrook testified as follows:

> The first discussions evolved about what is the deal because Mr. Baumgarten basically handled the Shaw agency business directly. It wasn't really delegated to anyone other than maybe Janet Shaw. Janet Shaw, as I understand, is Mr. Shaw's daughter who worked for us in the contract underwriting department. And that the– we talked about conflict of interest because of the family relationship. Skip didn't have a problem with that. He trusted both Mr. Shaw and Janet to do the right thing and be part of that. And he felt comfortable with it. I didn't but that's neither here nor there. In those evolution of what is the deal with Jerry Shaw concerning – and it was primarily based around the 50/50 deal. And you can quote 50/50 deal because based on Shaw– produced business, Skip felt like that Mr. Shaw had some, had a 50/50 deal with him; that once all of the net costs, without going into great detail because the net cost fluctuated on a year-to-year basis on what was included and not included, that they basically had Jerry Shaw with – and Skip used this term quite a bit, that Jerry had skin in the game; that bonds he produced, he had some risk that was associated with that. And that in the discussions early on about the two contracts, there was one that had a 75/25 split that was secured by letter of credit in some way from Jerry that got changed. Holbrook Dep., p. 27, lines 7-15, p. 28, lines 1-8.

"various oral modifications" to the agreements between Plaintiffs and ACIC.  Pls.' Third Application at 2.  Plaintiffs allege that initially the terms of the joint venture agreement between Plaintiffs and ACIC were set forth in writing.  However, that agreement was subsequently modified orally in many crucial respects.  Notably, these oral modifications occurred during communications between Skip Baumgarten and Jerry Shaw, President of Shaw and Associates, Inc. and Jerry Shaw and Associates, Inc.  Although other members of ACIC's senior management knew that Skip Baumgarten and Jerry Shaw had orally modified the terms of the written joint venture agreement, none of them were privy to the complete and precise nature and terms of these oral modifications.  *See e.g.*, Holbrook Dep., Pls.' Reply, Ex B.[3]  Thus, only Skip Baumgarten knew the full terms of ACIC's business relationship with Plaintiffs.

On July 15, 2001, Skip Baumgarten suffered a debilitating heart attack.  To this day, Mr. Baumgarten is unable to communicate and thus unable to testify or provide evidence regarding the oral modifications of the joint venture agreement.  Because of this situation, Plaintiffs contend it is crucial that ACIC preserve and produce any evidence created by Skip Baumgarten prior to his heart attack regarding the terms of the joint venture agreement between Plaintiffs and ACIC.

---

[3] Mr. Holbrook testified as follows:

> I never participated in any meeting in which Mr. Shaw and Mr. Baumgarten discussed a specific deal that was going to change or be different than what they did.  Do I know they had discussions along those lines?  Yes.  Do I know what those discussions were?  Just filtered through Mr. Baumgarten because Mr. Baumgarten handled the Shaw agency.  Holbrook Dep., p. 39, lines 8-14.

**Request for Production No 38**

On **November 3, 2004**, Plaintiffs served its Requests for Production of Documents and Things upon ACIC. Pls.' Ex. A. Request for Production No. 38 asks for the following:

> Access to all computer hard drives for copying of DOCUMENTS related to SHAW for the following people or departments while employed with or in a relationship with YOU from 1994 to present: (a) Andy Faust; (b) Skipper Baumgarten; (c) Mike Holbrook; (d) Jim Ferguson; (e) Lee Back; (f) Bob Thomas; (g) Peter Wall; (h) Bill Levine; (i) Janet Shaw; (j) Peter Wall; (k) YOUR Surety Bond Claims Department; (l) YOUR Surety Bond Underwriting Department

*Id.* at 8. In its December 7, 2004 response to Request for Production No. 38, ACIC objected to the request (1) "on the basis that it [was] vague, ambiguous, overbroad, unduly burdensome, and indefinite in scope and (2) "on the basis that it [was] not calculated to lead to the discovery of admissible evidence . . . ." Pls.' Ex. B at 14-15. Notwithstanding these objections, ACIC produced thousands of pages of internal ACIC email. Pls.' Third Application at 2. In response to Plaintiffs' direct inquiries, ACIC presented to Plaintiffs that it had produced all relevant documents from the hard drives of ACIC's senior management personnel.

**Request for Production No. 57**

On **June 24, 2005**, Plaintiffs served its Second Request for Production of Documents and Things upon ACIC. Pls.' Ex. D. Plaintiffs' Second Request for Production No. 57 asks for:

> Any and all files maintained by any of the following individuals while employed by YOU from 1994 to the present which RELATE TO SHAW: (a) Andy Faust; (b) Skipper Baumgarten; (c) Mike Holbrook; (d) Jim Ferguson; (e) Lee Back; (f) Bob Thomas; (g) Peter Wall; (h) Frank M. Lanak; (i) Bill Levine; (j) Janet Shaw; (k) Corby Baumgarten

Pls.' Ex. D (Plaintiffs cite to Exhibit C but the Exhibit is docketed as Exhibit D). On **July 28, 2005**, ACIC served its responses and, as to Request No. 57, asserted it had "already produced all

4

non-privileged documents responsive to this request." Pls.' Ex. C (Plaintiffs cite to Exhibit D but the Exhibit is docketed as Exhibit C).

Plaintiffs reviewed the documents ACIC produced and concluded that ACIC had not produced emails from Skip Baumgarten to others at ACIC or emails to Skip Baumgarten from others at ACIC. Plaintiffs knew Skip Baumgarten was a regular user of email. Additionally, pursuant to subpoenas, third parties had produced certain emails from ACIC employees to the third party but ACIC had failed to provide these same emails. Therefore, on **August 17, 2005**, Plaintiffs addressed this issue with ACIC in a telephone conversation. Pls.' Ex. E. Plaintiffs followed-up the telephone conversation with a letter dated on the same day. *Id.* The August 17, 2005 letter, indicates that ACIC agreed to "represent in writing the details of the disposition of the computer and to identify the last person known to have possession of it." *Id.* Plaintiffs claim that although ACIC agreed to do this, it never provided any details regarding their knowledge of Skip Baumgarten's laptop computer, its hard drive, or their efforts to locate it.

Plaintiffs also claim Skip Baumgarten used two home computers for work purposes. Although ACIC represented to Plaintiffs that it has examined these computers for responsive documents, it has not produced any documents originating from the home computers.

Plaintiffs assert that up until **August 17, 2005**, they believed ACIC had produced all relevant documents that "might once have resided on the computer hard drives of ACIC's senior management, including Skip Baumgarten." Pls.' Third Application at 4. However, on August 17, 2005, Plaintiffs deposed Corby Baumgarten, Skip Baumgarten's wife. At that deposition, Mrs. Baumgarten produced, *inter alia,* a September 24, 2001 letter from Andy Faust to her. Pls.' Ex. F to Pls.' Third Application. The letter contained handwritten notes. Mrs. Baumgarten testified

5

that the handwriting on the letter were notes she took while discussing the letter with Andy Faust. Baumgarten Dep., p. 42, lines 20-23; Pls.' Ex. G to Pls.' Third Application.  One of the handwritten notes states, "shortly after you learned of Skip's heart attack, you dumped his email." Pls.' Ex. F to Pls.' Third Application.  Mrs. Baumgarten testified that "you" referred to Andy Faust.  Baumgarten Dep., p. 48, line 5; Pls.' Ex. G to Pls.' Third Application.  Mrs. Baumgarten testified that Andy Faust "erased Skip's e-mail on Skip's laptop computer at the office." Baumgarten Dep., p. 49, lines 8-9; Pls.' Ex. G to Pls.' Third Application.  Andy Faust submitted an affidavit attesting he deleted Skip Baumgarten's emails on **July 17, 2001**.  Def. ACIC's Resp.; Faust Aff. ¶3.  However, she did not ask Andy Faust why he did it and testified the laptop computer was given to someone else at the office but did not know who received it.  *Id.*

Plaintiffs claim that prior to Mrs. Baumgarten's August 17, 2005 deposition testimony, ACIC had not disclosed that any of Skip Baumgarten's email had been deleted thus they were "completely unaware of the issue."  Pls.' Third Application at 5.  Accordingly, Plaintiffs sought more information on the issue.

On August 18, 2005, Plaintiffs deposed James Ferguson, ACIC's Chief Financial Officer. Mr. Ferguson testified that he was aware that shortly after Skip Baumgarten's heart attack Andy Faust deleted all of Skip Baumgarten's email from his laptop computer.  Ferguson Dep., p. 158, lines 21-23; Ex. D to Pls.' Reply.

On August 24, 2005, Plaintiffs deposed James (Mike) Holbrook, ACIC's Corporate Counsel at the time of Skip Baumgarten's heart attack.  Mr. Holbrook testified that he was aware that shortly after Skip Baumgarten's heart attack Andy Faust deleted emails from Skip Baumgarten's laptop computer.  Holbrook Dep., p. 145, lines 19-25, Ex. B to Pls.' Reply.

Holbrook testified that Andy Faust claimed he had deleted the emails to "protect Skip's private life." *Id.*, p. 148, lines 4-13.  However, Mr. Holbrook did not believe Andy Faust's reason for deleting the emails, stating, "I thought [Skip Baumgarten needed protection from Andy Faust before Andy deleted his e-mails. I perceived that Andy needed to protect Andy." *Id.*, p. 177, lines 22-25, p. 178, lines 1-3.  This happened at a time when, shortly after Skip Baumgarten's heart attack, Jerry Shaw had called to set up a meeting because he was concerned about his relationship with ACIC. *Id.*, p. 46, lines 10-25, p. 47, lines 1-25.  Mr. Holbrook further testified that George Hadley had attempted to recover the material deleted but was unsuccessful. *Id.,* p. 146, lines 1-15.  Mr. Holbrook testified the laptop was "cleaned" and assigned to Bob Thomas. *Id.*, p.147, lines 4-15.

    Next, Plaintiffs contend that the fact that it was Andy Faust who deleted the email is highly relevant for several reasons.  First, immediately after Skip Baumgarten's heart attack, Andy Faust launched a bid to be named ACIC's new CEO and sought to protect the position of other management team members.  When his bid for CEO failed, Andy Faust blamed Jerry Shaw.  Pls.' Ex. I to Pls.' Third Application.  Moreover, after ACIC created a three-person Executive Committee comprised of Bill LeVine, Corby Baumgarten, and Andy Faust to act as CEO, it was Andy Faust who addressed issues concerning Jerry Shaw.

    Second, Plaintiffs contend that Andy Faust used his dominant position on the ACIC Executive Committee to bring about ACIC's termination of the seven year ACIC-Shaw relationship.  This created problems for Plaintiffs because Plaintiffs were not able to serve its clientele and ultimately resulted in Plaintiffs' demise.  Plaintiffs submitted an **August15, 2001** "Memorandum to the File" and an **August 22, 2001** letter from Andy Faust to Bill LeVine, Corby

7

Baumgarten, and Ron Baumgarten to support this contention.  Pls.' Ex. I & J to Pls.' Third

Application.  In the August 15, 2001 Memorandum to the File, Andy Faust wrote:

> Bill Levine came in.  We had discussions about the management structure interim of the company as the reinsurers were setting up to come visit.  The reinsurers are most always concerned, in a situation like this, i.e. Skips health, about the continuity of the company, the direction of the company, the game plan of the company and the leadership of the company.  Bill advised me he wished to change nothing from the way it is.  I feel that this is likely not going to be an acceptable situation for the reinsurer(s), both the current, Swiss Re and any potential new reinsurer, e.g. XL Re, formerly NacRe.  Part of my job is to make Bill understand this and act on it, but I am not sure it can be done for various reasons, all from my point of view, political.
>
> ** ** ** ** ** ** ** ** ** **
>
> We discussed Jerry Shaw and the letter I feel needs to be sent to Jerry to formally and specifically outline his restrictions in authority as regards reinsurance directives from our reinsurer, Swiss R.  Originally, Bill advised me that he wanted no letter sent as his desire was that everything go just like it did prior to Skips incident.  I told him that was unacceptable to me because as president of the company, I had a duty to the company, to the stockholders, to the reinsurer, and to the dept of insurance to protect the solvency of the company and protect the assets of the reinsurer.  I could not knowingly sit by and and (sic) allow the warranties of the reinsurance agreement to be violated, willingfully (sic) and consistently, and not take action to prevent it.  I asked Bill if he would at least meet with Lee, Jim & Mike and get their input.  I also asked Regen to join us, as head of contract underwriting, but Bill did not want him to attend the meeting.  There was a discussion as to the situation.  After some discussion, Bill decided that Mike Holbrook would write a letter to Jerry Shaw, outlining specifics of the reinsurance agreement as it relates to the authority of Jerry Shaw.  Mike would show Andy and the group the letter and it would be decided if it were to go out.
>
> In the evening I had a discussion with Frank Jr. about the problem.  I asked him if in his opinion Jerry Would (sic) get involved in handling a claim without advising the company.  He advised me that he had done it in the past so in my opinion he would likely do it in the future.

Pls.' Ex. J to Pls.' Third Application.  In the August 22, 2001 letter, Andy Faust wrote in

pertinent part:

> Next of course comes the Shaw matter.  No matter what Mr. Shaw may say to any of you he has one motive and only one motive and that is to get rid of me.  I do not blame Jerry.  Most all bond specialty type agents (there might be one or two who would not), agents would likely do the same thing.  It is not to their over all interest for a company, they wish to take serious advantage of, to have an individual there, in a position of power, who understands exactly what they are doing and how they are doing it and how seriously the can expose the company to ruin, all to their financial enrichment.  No matter what you may believe to be the case, all I did with Jerry, on his $7+ million dollar bid bond request, was ask him for information

>regarding the accounts footnote to his contractors financial statement about lawsuits in process.
>
>**  **  **  **  **  **  **  **  **
>
>At any rate what we have now, is an agent who we have given $1.5 million authority with $3 million aggregate who wont even speak tot he President of the company or the head of the contract underwriting department.  People, he can put this company in receivership, with irresponsible underwriting and risk taking, all of which is to his financial advantage.  By the way, in 2000, we were the second largest surety writer in California.  If we had zero business from Shaw, we would still be the second largest writer in California.  Traverlers is $1.1 million in front of us, and Firemans Fun is in 3rd, $4 million behind us.

Pls.' Ex. I to Pls.' Third Application.  Significantly, ACIC did not produce this letter to Plaintiffs. Pls.' Reply at 5, n. 5.  Plaintiffs became aware of this letter at Mrs. Baumgarten's deposition. Plaintiffs contend that since discovering that Andy Faust deleted records from Skip Baumgarten's computer in July and now having knowledge of Andy Faust's efforts to gain control of ACIC, they are concerned that Andy Faust and others ACIC employees may have deleted and destroyed records, including email, from other ACIC computers.  Therefore, Plaintiffs move the Court for an order compelling ACIC to produce for inspection and examination by appropriate experts: "(1) any and all computer hard drives utilized by key ACIC management personnel from 1994 through 2002, i.e., Skip Baumgarten, Andy Faust, Mike Holbrook, Lee Back, Bob Thomas and Bill LeVine; (2) all backup media of such hard drives, including email servers, backup tapes, discs of emails, or any other storage device used to preserve copies of the contents of the relevant hard drives, and (3) any manuals, logs, schematics, software or maps regarding ACIC's maintenance of its information technology system, including records as to the chain of custody, necessary to understand and follow up on the issues created by Faust's intentional deletion of Skip Baumgarten's email."  Pls.' Third Application at 8.

ACIC opposes Plaintiffs' motion to compel for the following reasons: (1) Plaintiffs have waived their right to compel the production of ACIC computer hard drives because they never addressed ACIC's objection to the production of these items; (2) Andy Faust's deletion of Skip Baumgarten's email occurred before ACIC could have reasonably anticipated litigation with Plaintiffs; (3) Plaintiffs have not been prejudiced; and (4) Plaintiffs have not shown that ACIC engaged in any widespread destruction of files to warrant access to ACIC computer hard drives.

ACIC contends Plaintiffs' request for the computer hard drives of ACIC officers is untimely under Local Rule 26.6 . Local Rule 26.6 states in pertinent part: "A party served with objections to a request for production or inspection must proceed under D.N.M.LR-Civ. 37.1 within twenty (20) calendar days of service of an objection unless the response specifies that documents will be produced or inspection allowed." D.N.M.LR-Civ. 26.6. Accordingly, ACIC contends that Plaintiffs waived their right to compel the production of ACIC computer hard drives. ACIC's contention is based on its misunderstanding of Plaintiffs' position. Plaintiffs are not moving to compel production of the hard drives on the basis of their previous Request for Production No. 38 or Request for Production No. 57. Plaintiffs' present motion to compel is based on their recent discovery of ACIC's failure to disclose that ACIC President Andy Faust deleted documents from Skip Baumgarten's laptop computer. Accordingly, the Court rejects ACIC's argument that Plaintiffs have waived their right to compel the production of ACIC computer hard drives because they never addressed ACIC's objection to the production of these items.

ACIC's argument that Andy Faust's deletion of Skip Baumgarten's email occurred before ACIC could have reasonably anticipated litigation with Plaintiffs also fails. Plaintiffs have

presented sufficient evidence showing Andy Faust challenged, disapproved of, and attempted to interfere with Skip Baumgarten's (ACIC's) business arrangement with Plaintiffs.  ACIC admits that "[w]ithin hours of [Skip Baumgarten's] heart attack, and on or before July 17, 2001," ACIC President Andy Faust deleted emails from the hard drive of Mr. Baumgarten's laptop computer.  Faust Aff. ¶3, Resp. Ex. A (emphasis added).  Plaintiffs also have presented evidence to support their claim that Andy Faust took issue with the manner in which Skip Baumgarten conducted business with Jerry Shaw, developed a personal animus against him, and tried to interfere with that business relationship.  *See e.g.*, Pls.' Reply, Ex. A (1995 letter to Skip Baumgarten from Andy Faust pointing out what Mr. Faust perceived as liabilities in Jerry Shaw & Associates– (1) "Shaw is not as strong financially as these statements may lead one to believe." and (2) "The financial statements he is presenting on his agency are cash basis and are terribly inflated."); Holbrook Dep., p. 159, lines13-25 (Mr. Faust's belief was that the Shaw underwriting method was putting the company at a higher risk); p. 160, lines 1-18 ("There were numerous discussions between Mr. Baumgarten and Mr. Faust about Mr. Shaw's business. It's not what the company is about.  Skip liked the business anyway.  They went back and forth continually.  From '98 until July 15, 2001. ").  Plaintiffs presented evidence that Skip Baumgarten excluded Mr. Faust from his dealings with Jerry Shaw even though Mr. Faust was the President of ACIC.  *See* LeVine Dep., p.18, lines 9-11; Pls.' Reply Ex. C; Holbrook Dep., p. 27, lines 8-13 ("The first discussions evolved about what is the deal because Mr. Baumgarten basically handled the Shaw agency business directly.  It wasn't really delegated other than maybe Janet Shaw.").

Moreover, in his **August 24, 2005** Deposition, Mr. Holbrook testified that "shortly after Skips stroke, Jerry [Shaw] called, and I'm not sure – and again, he didn't do this through me, so I

11

don't know what his stated reasons were, but he wanted to have a meeting because he was concerned about his relationship with the company."  Holbrook Dep., p. 46, lines 18-18; Ex. B to Pls.' Reply.  Mr. Holbrook also testified that Jerry Shaw made that call on **July 16, 2001**.  In his **October 29, 2001** Deposition, Mr. Holbrook testified as follows:

> Q:  How soon after July 15th did discussions about the compensation that was, is or will be agreed upon with Mr. Shaw begin?
>
> A:  The first discussions were on the **16th of July**.
>
> Q:  How did those discussions arise?
>
> A:  Those discussions arose at the request of Mr. Shaw.
>
> Q:  How did those discussions occur?
>
> A:  Those discussions occurred by phone.
>
> Q:  Did Mr. Shaw call the company?  Did the company call Mr. Shaw?
>
> A:  I believe Mr. Shaw called the company, but I'm not certain.  That call was not placed to me.
>
> ** ** ** ** ** ** ** **
>
> Q:  What happens next?
>
> A:  **There are internal discussions among the company about what the relationship is.  There is pulling the agency files to determine what the agency agreements in force are**.
>
> Q:  Who participates in those discussions within the company?
>
> A:  **Myself, Mr. Faust, Regan James, Frank Lanak.  At one point or another during those first couple of days**.

Holbrook Dep., p. 15, lines 9-25, p. 17, lines 1-11; Ex. H to Pls.' Reply (emphasis added).  Thus, as early as **July 16, 2001**, ACIC management knew that Jerry Shaw had requested a meeting to

discuss his concerns regarding whether ACIC would continue to honor his arrangement with ACIC's CEO Skip Baumgarten.

Morever, at the time George Hadley reformatted Skip Baumgarten's laptop computer, ACIC knew that litigation was very probable. By that date, **November 2001**, ACIC was apprised of "Jerry [Shaw's] total dissatisfaction with performance on the part of American Contractors Indemnity in treating his book of business." Holbrook Dep., p. 259, lines 10-12; Ex. H to Pls.' Reply. ACIC knew the importance of the information contained in Skip Baumgarten's laptop computer because he was the only ACIC executive that knew the business arrangement between Plaintiffs and ACIC. Reformatting the Skip Baumgarten's laptop computer was prejudicial to Plaintiffs. Accordingly, the Court will grant Plaintiffs' motion but only as to Skip Baumgarten and Andy Faust. Within fourteen days from entry of this Memorandum Opinion and Order, ACIC shall produce for inspection and examination by appropriate experts any and all computer hard drives and any backup media used from 1994 through 2002 by the following: (1) Skip Baumgarten and (2) Andy Faust. The Court will defer ruling on Plaintiffs' request for sanctions until after ACIC produces the requested materials.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiffs' Third Application for an Order Compelling Discovery From Defendant ACIC is GRANTED, in part and denied in part. Defendant ACIC shall produce for inspection and examination by appropriate experts any and all computer hard drives and any back up media used from 1994 through 2002 by Skip Baumgarten and Andy Faust.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**