# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**SHAW AND ASSOCIATES, INC., a New
Mexico corporation; and JERRY SHAW AND
ASSOCIATES, INC., an Arizona corporation,**

      **Plaintiffs,**

**vs.**                              **No. CIV 04-0123 WJ/DJS**

**AMERICAN CONTRACTORS INDEMNITY
COMPANY, a California corporation,**

      **Defendant.**


## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      **THIS MATTER** is before the Court on Plaintiffs' Motion to Strike Defendant's Answer

and Counterclaim and for Entry of Default, or in the Alternative, for Establishment of Certain

Facts and Other Sanctions **[Doc. No. 182]**, filed May 25, 2006, and fully briefed on June 26,

2006.  In their motion, Shaw and Associates, Inc., a New Mexico corporation, and Jerry Shaw

and Associates, Inc., an Arizona corporation (collectively "Plaintiffs") complain about alleged

discovery abuses and violations of this Court's discovery orders by Defendant American

Contractors Indemnity Company ("ACIC").  Because the requested relief could have a dispositive

effect, on June 2, 2006, pursuant to 28 U.S.C. §636(b)(1)(B), the Honorable William Johnson

entered an Order of Reference **[Doc. No. 184]**, referring this matter to the Honorable Don J. Svet

for legal analysis and recommendation as to the ultimate disposition of Plaintiffs' motion.[1]   The
Court held a hearing on Plaintiffs' motion to strike on September 14, 2006.

## I.  Factual and Procedural Background

In their Second Amended Complaint, Plaintiffs allege Jerry Shaw, Plaintiffs' President and
principal shareholder, began a business relationship with Skipper Baumgarten, ACIC's founder,
principal shareholder, CEO and Chairman, sometime in September 1994.  Compl. ¶ 9. ACIC was
a newly acquired and small surety company based in Los Angeles, California.  *Id.*  According to
Plaintiffs, at that time, ACIC lacked the Treasury listing required to participate in the more
lucrative market for payment and performance bonds on construction projects (contract bonds),
lacked an A.M. Best Rating which precluded ACIC from writing contract bonds on most public
works projects, and lacked the licenses, capital, surplus and reinsurance relationships necessary to
write contract bonds in significant amounts.  Pls.' Resp. to Def.'s Mot. for Summ. J. at 2.  In
contrast, Jerry Shaw had been operating Shaw and Associates, Inc. since 1983 and had been a
major producer of contract bonds in New Mexico.  *Id.* at 3.  Thus, Jerry Shaw had been involved
in the bonding industry for more than two decades and had a substantial book of business when he
met Skip Baumgarten in 1994.  *Id.*

Initially, Plaintiffs and ACIC entered into a joint venture involving Plaintiffs representation
of ACIC for the purpose of jointly conducting a surety business.  Compl. ¶9.  In October 1994,
Shaw and Associates, Inc. and ACIC entered into a written General Agency Agreement covering

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and
recommendations, that party may file written objections to such proposed findings and
recommendations pursuant to 28 U.S.C. §636(b)(1)(C).  A party must file any objections within
the ten day period allowed if that party seeks appellate review of the proposed findings and
recommendations.  If no objections are filed, no appellate review will be allowed.

the state of New Mexico.  Pls.' Resp. to Def.'s Mot. for Summ. J. at 3.  In November 1994, Jerry Shaw and Associates, Inc., d/b/a Shaw and Hren Surety Bond Agents, and ACIC entered into a written General Agency Agreement covering the state of California . *Id.*  In November 1995, Plaintiffs and ACIC executed a new General Agency Agreement covering the states of New Mexico and California which retroactively changed the profit and loss participation from a 75/25 split to a 50/50 deal where each party bore an equal share of profits and losses on all bonds produced by Plaintiffs. Pls.' Resp. to ACIC's Mot. for Summ. J. at 4.

According to Plaintiffs, Mr. Baumgarten initiated discussions with Jerry Shaw regarding placing substantially all of Plaintiffs' contract surety bond business with ACIC. *Id.*  Jerry Shaw alleges Mr. Baumgarten proposed a business relationship between ACIC and Plaintiffs whereby Plaintiffs would become a joint venture partner on a significantly expanded basis with ACIC with respect to the surety business Plaintiffs would produce for ACIC. *Id.*

Under this alleged proposed agreement, ACIC gave Plaintiffs (1) significant underwriting authority on Plaintiffs' book of business and (2) substantial input, involvement and responsibility with respect to claims investigation, adjustment and salvage activities on bonds produced by Plaintiffs. *Id.*  Plaintiffs also played a role as counselor to Mr. Baumgarten and ACIC with respect to certain management and reinsurance functions. *Id.*  Moreover, Plaintiffs allegedly were to share equally with ACIC in the gross premium revenues Plaintiffs generated for ACIC, minus the premium taxes and net reinsurance costs. *Id.*  Plaintiffs were also to share equally with ACIC in the net ultimate losses incurred on Plaintiffs' book of business placed with ACIC. *Id.*

Relying on ACIC's representations with respect to the terms and conditions under which Plaintiffs would conduct business with ACIC, on or about October 24, 1994, Plaintiffs began to

produce, underwrite, manage and adjust claims on surety bonds on a greatly expanded basis for

ACIC and, in all other respects, began to transfer Plaintiffs' book of business to ACIC.  Compl.

¶10.  By July 1998 and through July 2001, Plaintiffs claim ACIC, through Mr. Baumgarten, took

certain actions to induce Jerry Shaw to place Plaintiffs' book of business with ACIC.  Compl. ¶11.

ACIC, through Mr. Baumgarten, took the following actions, *inter alia*, (1) authorized Plaintiffs to

communicate directly with ACIC's reinsurer on underwriting issues; (2) promoted the

appointment of Jerry Shaw to ACIC's Board of Directors; (3) gave Plaintiffs broad underwriting

authority and Powers of Attorney to execute bonds on ACIC's behalf; (4) authorized Plaintiffs to

work actively with bond principals and indemnitors in the investigation and adjustment of claims

on bonds Plaintiffs produced as well as in implementing or counseling the execution of strategies

to maximize recoveries of salvage; (5) asked Plaintiffs to participate with ACIC management in

presenting and negotiating terms with ACIC's reinsurers; (6) arranged for an affiliate of ACIC's

reinsurer to authorize Plaintiffs to execute bonds for the affiliate with ACIC reinsuring the affiliate

in order to service Plaintiffs' book of business in Arizona prior to ACIC being licensed to issue

bonds in Arizona; and (7) instructed its personnel not to authorize or execute bonds for principals

in Arizona and New Mexico because Plaintiffs were to be ACIC's exclusive producer in those

states.  Compl. ¶11.

To foster the business relationship between Plaintiffs and ACIC, Plaintiffs allege Mr.

Baumgarten excluded Andy Faust, ACIC's President, from any involvement with respect to all

bonds produced by Plaintiffs for ACIC.  *Id.*  Mr. Faust was the executive responsible for ACIC's

contract surety business.  *Id.*  Plaintiffs claim Mr. Baumgarten excluded Andy Faust because he

was not supportive of the business relationship between ACIC and Plaintiffs and lacked the skills

and temperament necessary to work with Jerry Shaw in underwriting Plaintiffs' book of business. *Id.* Significantly, Plaintiffs allege Mr. Baumgarten designated himself as the sole decision maker within ACIC as to any matters between Plaintiffs and ACIC. Compl. ¶11. Moreover, Plaintiffs allege Mr. Baumgarten, from time to time, informed ACIC's managers, general counsel, and the Board of the nature, breadth and scope of ACIC's business relationship with Plaintiffs. *Id.* Plaintiffs also allege Mr. Baumgarten informed ACIC's managers, general counsel, and the Board discussions were ongoing with Jerry Shaw regarding the timing and terms of a pooling of interests merger between ACIC and Plaintiffs. *Id.*

Finally, Plaintiffs allege ACIC requested Plaintiffs not request distribution of almost all premium revenues earned in excess of an agreed upon provisional commission in order to improve ACIC's periodic statements of financial condition. *Id.* Plaintiffs agreed to this request but, in consideration of this accommodation, ACIC agreed to accrue to Plaintiffs' account sums equal in percentage to the earnings made by ACIC on its liquid assets and not charge Plaintiffs' account with any general or specific loss reserves. Plaintiffs and ACIC also agreed neither would accrue or charge the other or their joint venture for any internally incurred costs of underwriting or claims handling. *Id.*

Plaintiffs allege ACIC and Plaintiffs operated under this implied in fact and law agreement based on these terms, understandings and course of dealings during the period of October 24, 1994 to the present. Compl. ¶12. Plaintiffs further allege, although ACIC and Plaintiffs initially reduced some of the terms of their agreements to various written contracts, due to the relationship of trust and confidence that developed between Jerry Shaw and Mr. Baumgarten, neither insisted on the preparation and execution of full, complete and integrated written contracts

memorializing all the terms of their agreement and joint venture.  *Id.*  Instead, ACIC and Plaintiffs relied on their acts, words and good faith conduct to represent the basis and terms of their relationship.  Compl. ¶12.

Plaintiffs further allege they produced bonds for the joint venture and generated approximately 11.5 million dollars in premiums from its customer base in reliance of the foregoing, during the period October 1994 through approximately November 2001.  Compl. ¶13.  Plaintiffs also allege they produced gross income to be shared with ACIC of at least $9.5 million, after deductions for premium taxes and net reinsurance costs,.  *Id.*  Plaintiffs contend there is a balance of approximately $3.0 million, as of early 2002, which ACIC has not accounted for or distributed to Plaintiffs.

According to Plaintiffs, by July 1998, due to Plaintiffs transferring substantially the entirety of Plaintiffs' book of business to ACIC, Plaintiffs were completely dependent on ACIC for Plaintiffs' continued viability and success.  Compl. ¶14.  In July 2001, Mr. Baumgarten suffered a massive stroke, rendering him permanently incapacitated and unable to communicate.[2] Compl. ¶15.  Mr. Baumgarten could no longer carry out his responsibilities as Chairman and CEO of ACIC and was unable to carry out ACIC's responsibilities to Plaintiffs.  *Id.*

Plaintiffs allege Andy Faust began to interject himself into ACIC's dealings with Plaintiffs soon after Mr. Baumgarten became incapacitated.  Compl. ¶16.  Plaintiffs allege Mr. Faust initiated a course of dealing and conduct with Plaintiffs which effectively denied Plaintiffs the

---

[2] In Plaintiffs' Third Application [Doc. No. 105] Plaintiffs state Mr. Baumgarten suffered a massive heart attack.  Pls.' Third Application at 2, n.2. Whether Mr. Baumgarten suffered a massive heart attack or a stroke is of no consequence.   It was his resulting incapacitation that made it impossible for his to carry out ACIC's alleged responsibilities to Plaintiffs.

benefits of the Shaw/ACIC agreements.  *Id.*  According to Plaintiffs, Mr. Faust engaged in, *inter alia*, the following conduct: (1) informed Plaintiffs they no longer had authority to underwrite and execute bonds in the manner and at the levels previously practiced with ACIC; (2) capriciously and arbitrarily insisted on different definitional criteria for underwriting bonds proposed by Plaintiffs thus interfering with customer relations; (3) restricted Plaintiffs' right to distribute bonds and failed to distribute them in a timely manner thus affecting customer service to Plaintiffs' customers; (4) misrepresented the underwriting requirements of ACIC's reinsurers to wrongfully reject Plaintiffs' bond submissions; (5) wrongfully issued cancellation notices to Plaintiffs' customers on license and miscellaneous bonds; (6) interfered with Plaintiffs' relationships with customers by unnecessarily delayed responses to time sensitive bond requests; (7) delayed or denied approval on Plaintiffs' bond applications by falsely claiming ACIC had not received underwriting documentation previously provided by Plaintiffs;  (8) treated Plaintiffs' personnel in an insulting and demeaning manner so as to discourage open, timely and professional communication between the parties; (9) attempted to impose modified risk sharing responsibility on Plaintiffs as a condition of approval of bond applications; (10) precluded the previous customary service to Plaintiffs and Plaintiffs' customers by removing ACIC personnel familiar with the terms and conditions of the Agreements between Plaintiffs and ACIC and course of dealing between them; and (11) interfered with the process of submissions for special purposes. *Id.*

On or about **October 22, 2001**, after assuming his new position of CEO and cognizant of the escalating dispute between Plaintiffs and ACIC, Robert Thomas arranged a group meeting between ACIC, Mr. Shaw, and Shaw's counsel, Richard Corona, in Los Angeles, California.  The

7

ACIC representatives who attended this meeting included Robert Thomas, <u>Mike Holbrook</u>, Lee

Back and Frank Lanak.  Def.'s Objections and Responses to Plaintiffs' First Set of Interrogs.;

Pls.' Resp.  to Def.'s Mot. for Summ. J., Ex. W.  Because of Mr. Faust's aforementioned

conduct, on or about **<u>November 2001</u>**, Plaintiffs advised Mr. Faust and other ACIC senior

management that Mr. Faust's conduct was in violation of the "Agreements, course of dealing and

relationship of trust and confidence under which [Plaintiffs] and ACIC were bound to operate."

Compl. ¶17.  Plaintiffs further advised ACIC that, if ACIC did not take action and restrain Mr.

Faust's conduct, it would cause Plaintiffs' demise.  *Id.*  Notwithstanding, Plaintiffs allege Mr.

Faust and ACIC did not change their conduct toward Plaintiffs, but, instead, seemed to intensify

efforts to sabotage Plaintiffs' relationship with ACIC and bring about Plaintiffs' demise.  Compl.

¶18.  Due to Mr. Faust's and ACIC's conduct, and because of the impossibility of timely

obtaining a similar surety facility to replace ACIC, Plaintiffs were forced to sell Plaintiffs' book of

business in New Mexico and Arizona and refer much of its contract surety business in California.

Compl. ¶19.

Plaintiffs further allege they attempted to resolve their claims against ACIC from January

2002 to August 2003, after being forced to shut down operations.  Compl. ¶20.  By August 2003,

it became apparent to Plaintiffs that satisfactory resolution of the dispute with ACIC was not

possible.  Subsequently, Plaintiffs filed this action against ACIC, alleging the following: (1) breach

of contract; (2) accounting and dissolution; (3) breach of implied covenant

of good faith and fair dealing; (4) breach of fiduciary duty; (4) conversion; (5) interference with existing contractual relationships; (6) interference with prospective economic advantage; (7) declaratory relief; (8) violation of insurance code regarding agent's rights; and (9) prima facie tort.

On September 7, 2005, Plaintiffs filed a Third Application for an Order Compelling Discovery from Defendant American Contractors Indemnity Company and Motion for Sanctions [Doc. No. 105]. Plaintiffs moved the Court for an order compelling ACIC to comply with Plaintiffs' Request for Production Nos. 38 and 57. According to Plaintiffs, during the course of discovery, ACIC had failed to disclose that Mr. Faust deleted emails from Mr. Baumgarten's laptop computer shortly after his stroke/heart attack. As a result, Plaintiffs conducted critical depositions, including Mr. Faust's deposition, without benefit of this vital information. Therefore, Plaintiffs moved the Court for an order compelling ACIC to produce for inspection and examination by appropriate experts all computer hard drives used by key ACIC management personnel from 1994 through 2002, i.e., Skip Baumgarten, Andy Faust, Mike Holbrook, Lee Back, Bob Thomas and Bill Levine. Plaintiffs also requested all backup media of these hard drives, including email servers, backup tapes, discs of emails, or any other storage device used to preserve copies of the contents of the relevant hard drives and any manuals, logs, schematics, software or maps regarding ACIC's maintenance of its information technology system, including records as to the chain of custody necessary to understand and follow up on the issues created by Mr. Faust's intentional deletion of Mr. Baumgarten's email.

After a careful review of the parties' pleadings and voluminous exhibits, the Court found "ACIC had admitted that '[w]ithin hours of [Skip Baumgarten's] heart attack, and on or before

9

July 17, 2001,' ACIC President Andy Faust deleted emails from the hard drive of Mr.

Baumgarten's laptop computer."  February 1, 2006 Mem. Op. and Order at 11 [Doc. No. 155].

The Court also found Plaintiffs had presented sufficient evidence showing Mr. Faust challenged,

disapproved of, and attempted to interfere with ACIC's business arrangement with Plaintiffs and

took issue with the manner in which Mr. Baumgarten conducted business with Jerry Shaw,

developed a personal animus against him, and tried to interfere with that business relationship.  *Id.*

The Court further found Plaintiffs presented evidence Mr. Baumgarten excluded Mr. Faust from

his dealings with Jerry Shaw even though Mr. Faust was the President of ACIC.  *Id.*  Finally, the

Court found ACIC management knew Jerry Shaw had requested a meeting to discuss his

concerns regarding whether ACIC would continue to honor his arrangement with Mr.

Baumgarten as early as July 16, 2001, and, at the time George Hadley reformatted Mr.

Baumgarten's laptop computer (**November 2001**), ACIC knew litigation was very probable.

February 1, 2006 Mem. Op. and Order at 12-13.  The Court concluded ACIC had to know the

importance of the information contained in Mr. Baumgarten's laptop computer because ACIC

knew Mr. Baumgarten was the only ACIC executive who knew the business arrangement

between Plaintiffs and ACIC.  *Id.* at 13.  Based on all the evidence, the Court found Plaintiffs

were prejudiced by ACIC reformatting Mr. Baumgarten's laptop computer.  *Id.*  Accordingly, the

Court granted Plaintiffs' Third Application in part.  The Court granted Plaintiffs' Third

Application only as to Mr. Baumgarten and Andy Faust.  However, the Court deferred ruling on

Plaintiffs' request for sanctions until ACIC produced the requested materials.

On February 15, 2006, ACIC filed objections [Doc. No. 159] to the Court's February 1, 2006 Memorandum Opinion and Order.  On March 23, 2006, the Honorable William Johnson entered an order overruling ACIC's objections [Doc. No. 167].  This motion followed.

In the present motion, Plaintiffs move the Court to sanction ACIC by striking ACIC's Answer and Counterclaim to Plaintiffs' Second Amended Complaint and enter a default judgment, or in the alternative, establish certain facts as proven for purposes of trial.  Plaintiffs also request attorneys' fees and costs.  As grounds for Plaintiffs' motion, Plaintiffs contend ACIC intentionally destroyed evidence in contemplation of litigation, intentionally destroyed and/or inexplicably lost evidence during this litigation, withheld evidence and covered up the destruction of evidence, lacked candor with Plaintiffs and the Court with regard to discovery issues, and repeatedly failed to comply with discovery orders.

Plaintiffs complain ACIC only revealed it had reformatted Mr. Baumgarten's hard drive a second time in **May 2004,** after the Court entered its February 1, 2006 Memorandum Opinion and Order.  As a result of the **November 2001** and the **May 2004** reformatting, Plaintiffs' expert opined the contents of Mr. Baumgarten's hard drive are unrecoverable and thus unavailable to Plaintiffs.  However, Plaintiffs' expert was able to retrieve "snippets of data."  Plaintiffs' attorneys reviewed this data and submitted samples of this data to support their argument Mr. Baumgarten's hard drive contained relevant documents.[3]  Second, Plaintiffs complain ACIC

---

[3] Plaintiffs presented the following relevant fragments recovered by their expert: (1) an October 2001 letter from incoming CEO Robert Thomas discussing the status of Plaintiffs' relationship with ACIC and the need to promptly address the issue; (2) an undated fragment regarding several of Shaw's larger bond accounts which states that "[Jerry] Shaw's familiarity with the capabilities of the principals" and "Shaw's risk sharing participation in all the accounts he writes" gave ACIC "the comfort we need to write these accounts"; and (3) a series of fragments regarding First Pacific Surety, the only other bond producer with a profit sharing agreement with

admitted it had lost the hard drive to Mr. Faust's computer.  Third, Plaintiffs complain ACIC also admitted <u>the backup media did not contain any email from the relevant time periods and failed to provide any backup media for Word documents or any other documents other than email</u>.  Fourth, Plaintiffs complain ACIC informed Plaintiffs all the contents of Mr. Baumgarten's Palm Pilot were lost while in the custody of ACIC's lawyers.[4]   Finally, Plaintiffs complain ACIC failed to comply with the Court's order to produce all documents regarding the Janus Corporation, an account Plaintiffs contend was impacted by Mr. Faust's manipulations and one of their most significant customers.  Plaintiffs contend ACIC produced over 1200 documents  pursuant to the Court's order <u>after discovery had closed</u>, precluding Plaintiffs from using these documents in the depositions of key ACIC employees.  Moreover, Plaintiffs contend ACIC has still not produced all of the Janus documents, including a crucial memorandum Janet Shaw wrote to the Janus file regarding Mr. Faust's unilateral withdrawal of a $7 million Janus bond request placed with ACIC's reinsurer shortly after Mr. Baumgarten's heart attack.

## II.  Discussion

Pursuant to Rule 37(b) of the Federal Rules of Civil Procedure, Plaintiffs move the Court for sanctions against ACIC for spoliation of evidence.   Rule 37(b)(2) authorizes a district court to sanction a party who "fails to obey an order to provide or permit discovery . . . ."  Included among the available sanctions is "[a]n order ... dismissing the action or proceeding or any part thereof . . . ."  Fed.R.Civ.P. 37(b)(2)(C).  Although a district court is afforded discretion in

ACIC.  Plaintiffs assert ACIC never produced any of the listed documents.

[4] ACIC provided an affidavit from one of ACIC's attorneys attesting that 118 emails were lost but not relevant to the case.  *See* Def.'s Resp. in Opp'n to Pl.s' Mot. to Strike, Ex. I., Cooper Aff.

choosing an appropriate sanction, that discretion "is limited in that the chosen sanction must be both just and related to the particular claim which was at issue in the order to provide discovery." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir.1992) (internal quotation marks omitted). Dismissal with prejudice "represents an extreme sanction," *id.*, and thus is considered appropriate only in cases involving "willfulness, bad faith, or [some] fault" on the part of the party to be sanctioned. *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir.2005) (internal quotation marks omitted). However, the Tenth Circuit has defined "a willful failure" as "any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown." *In re Standard Metals Corp.*, 817 F.2d 625, 628-29 (10th Cir.1987), *vacated and reversed on other grounds sub nom. Sheftelman v. Standard Metals Corp.*, 839 F.2d 1383 (1987). "In many cases, a lesser sanction will deter the errant party from further misconduct." *Ehrenhaus*, 965 F.2d at 920. "Because dismissal with prejudice defeats altogether a litigant's right of access to the courts, it should be used as a weapon of last, rather than first, resort." *Id.* (internal quotation marks omitted).

"Before imposing dismissal as a sanction, a district court should ordinarily evaluate the following factors on the record: "(1) the degree of actual prejudice to the [other party]; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions."" *Gripe v. City of Enid*, 312 F.3d 1184, 1188 (10th Cir.2002) (quoting *Ehrenhaus*, 965 F.2d at 921). This list "is not exhaustive, nor are the factors necessarily" of equal weight. *Chavez*, 402 F.3d at 1044. "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases

on their merits is dismissal an appropriate sanction." *Ehrenhaus*, 965 F.2d at 921 (internal

quotation marks omitted).

The Court may also impose sanctions for attorney and party misconduct under its inherent

powers. *See Cambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991)(These [inherent] powers are

governed not by rule or statute but by the control necessarily vested in courts to manage their

own affairs so as to achieve the orderly and expeditious disposition of cases.)(quotations

omitted). Among those inherent powers is "the ability to fashion an appropriate sanction." *Id.* at

44; *see also Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1419 (10th Cir. 1997)

("[A] federal court possesses the authority to impose ... sanctions on its inherent power to control

and supervise its own proceedings.")(internal quotation marks omitted)(alteration in original).

Under its inherent power, the Court may sanction attorney and party misconduct for

spoliation of evidence. See *Jordan F. Miller Corp. v. Mid-Continent Aircraft Servs.*, No. 97-

5089, 1998 WL 68879, at **3 (10th Cir. Feb. 20, 1998)(unpublished opinion)(the authority for a

sanction for spoliation of evidence emanates from the inherent powers of the federal courts).

"[T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial

gives rise to an inference that production of the document would have been unfavorable to the

party responsible for its destruction." *See Aramburu v. The Boeing Company*, 112 F.3d 1398,

1407 (10th Cir. 1997). However, no adverse inference should arise from spoliation that is merely

negligent. *Id.*

Nonetheless, the Court's inherent power to sanction misconduct for spoliation of evidence

includes the power to enter a default judgment or a lesser sanction. *See Chambers*, 501 U.S. at

43-45. When considering sanctions, other than an adverse inference, for the spoliation of

evidence, the Tenth Circuit does not impose a similar requirement of bad faith.  *See Jordan F.*

*Miller Corporation,* 1998 WL 68879, at **4 (Tenth Circuit affirmed the sanction of dismissal of

the claim for the failure to preserve evidence even though the loss of the evidence was neither

intentional nor in bad faith).

When deciding whether to sanction a party for the spoliation of evidence, courts have

considered a variety of factors, two of which generally carry the most weight: (1) degree of

culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice

to the party.  *Id.*  In this case, ACIC relies on both factors to argue against sanctions.

## A.  Degree of Culpability

A litigant has a duty to preserve evidence he knows or should know is relevant to

imminent or ongoing litigation.  *Jordan F.Miller,* 1998 WL 68879, at **5 (citing *Dillion v.*

*Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993)).[5]

---

[5] ACIC cites to *Zubulake v. Warburg*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) for the
proposition that "[a] litigant is under no duty to keep or retain every document in its possession.
Instead, it has a duty to preserve only what it knows, or reasonably should know, is relevant in the
action, is reasonably calculated to lead to discovery of admissible evidence, is reasonably likely to
be requested during discovery or is the subject of a pending discovery request."  ACIC's Resp. in
Opp'n to Pls.' Mot. to Strike at 10-11.  *Zubulake* is very instructive in this case and further states:

> The broad contours of the duty to preserve are relatively clear.  That duty should certainly
> extend to any documents or tangible things (as defined by Rule 34(a)) made by individuals
> "likely to have discoverable information that the disclosing party may use to support its
> claims or defenses."  The duty also includes documents prepared *for* those individuals, to
> the extent those documents can be readily identified (e.g., from the "to" field in e-mails).
> The duty also extends to information that is relevant to the claims or defenses of *any* party,
> or which is "relevant to the subject matter involved in the action."  Thus, the duty to
> preserve extends to those employees likely to have relevant information– the "key players"
> in the case.

** ** ** ** ** ** ** **

The scope of a party's preservation obligation can be described as follows: Once a party

15

## 1.  Skip Baumgarten's Hard Drive, Palm Pilot and Backup Files

In its response to Plaintiffs' motion to strike, ACIC asserts, it "has complied with all discovery rules and all discovery orders from this Court."  ACIC's Resp. in Opp'n to Pls.' Mot. to Strike at 2.  Additionally, ACIC contends there is no "evidence of spoliation."  *Id.*  ACIC also offers to open discovery at its expense "**despite** . . . the fact that Shaw's computer experts did not find a single document authored by Mr. Baumgarten on his computer."  *Id.*  However, ACIC fails to appreciate Plaintiffs' position.  Plaintiffs' expert opined it could not retrieve any documents because of ACIC's actions.  ACIC reformatted Mr. Baumgarten's laptop computer's hard drive **twice.**  George Hadley first reformatted the hard drive in **November 2001.**  Incredibly, the second reformatting of Mr. Bumgarten's laptop computer took place in **May 2004**, four months after Plaintiffs filed this action.  ACIC claims the first reformatting of Mr. Baumgarten's hard drive was in the ordinary course of business.  As to the second reformatting of Mr. Baumgarten's hard drive, ACIC states, "[h]aving already been reformatted once it is illogical to conclude that the act was anything more than an innocent attempt to retire the computer to the travel pool."  ACIC Resp. at 18.

---

reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.

*Zubulake,* 220 F.R.D. at 218 (emphasis added).  In this case, Mr. Baumgarten and Mr. Faust were the "key players."  Morever, as late as May 2004, Mr. Hadley attested he reformatted Mr. Baumgarten's hard drive in the "ordinary course of business."  ACIC's Resp. in Opp'n to Pls.' Mot. to Strike, Ex.D, Hadley Aff. ¶8.  Notably, ACIC did nothing to preserve Mr. Faust's hard drive.  Mr. Hadley attested Mr. Faust's computer "sat on his desk" for approximately 2 months after his departure in **2003**.  The hard drive was then removed, a post-it note attached, and unceremoniously stored in the PC tech room.  ACIC never found the hard drive.  Based on the facts as presented by ACIC,  it failed its preservation obligation long after it should have reasonably anticipated litigation.

ACIC cites to Brian Antweil's affidavit and claims its counsel "advised Plaintiffs in February 2005, that years earlier (October 2001), Skip Baumgarten's computer had been reformatted and no documents could be retrieved from that computer."   Although ACIC cites to Exhibit D, Exhibit D is George Hadley's Affidavit.  Exhibit E is Brian F. Antweil's affidavit.  Mr. Antweil's affidavit states: "On or about February 15, 2005, while reviewing documents in Shaw's Albuquerque, New Mexico office, I informed counsel for Shaw that Skip Baumgarten's laptop documents could [not] be recovered from that computer.  I never said that the computer has been "disposed of."  ACIC's Resp. in Opp'n to Pls.' Mot. to Strike, Ex. E, Antweil Aff. ¶3.

To refute Mr. Antweil's affidavit, Plaintiffs submitted an affidavit from their counsel attesting: "Specifically with respect to the laptop computer used by Skip Baumgarten while he was CEO of ACIC, Mr. Antweil told me that [the] computer had been used by a number of people since Mr. Baumgarten's July 15, 2001 incapacitating heart attack.  I specifically recall Mr. Antweil telling me, with respect to Skip's computer, "It's gone."  Pls.' Reply, Ex. F, Iannitelli Aff. ¶4.

Additionally, Plaintiffs take issue with ACIC's representation that Mr. Faust "possibly" deleted Mr. Baumgarten's emails.  *See*, e.g., ACIC's Resp. at 6; Ex. H, Faust Aff. ¶3 (attesting he "accessed, answered, and possibly deleted certain e-mails from Mr. Baumgarten's office computer");  Ex. F, Holbrook Aff. ¶3 (attesting "Andrew Faust, then-president of ACIC, possibly deleted e-mails from Mr. Baumgarten's laptop computer").  However, this is a nonissue since ACIC has acknowledged Mr. Faust deleted Mr. Baumgarten's emails soon after Mr. Baumgarten's heart attack.

Plaintiffs also takes issue with Corby Baumgarten's representation that Jerry Shaw knew Mr. Faust deleted Mr. Baumgarten's email in the fall of 2001. Corby Baumgarten claims "she had several conversations and teleconferences in and around ACIC board meetings attended by Mr. Shaw about the deleted e-mails." Def.'s Resp., Ex. G, Baumgarten Decl. ¶ 4. To refute Mrs. Baumgarten's claim, Plaintiffs submitted Jerry Shaw's affidavit attesting he was not aware Mr. Faust had deleted Mr. Baumgarten's email until Cory Baumgarten's August 17, 2005 deposition. Pls.' Reply, Ex. A, Shaw Aff.¶6. Jerry Shaw also attested he was present at ACIC Board of Directors meetings held on October 23, 2001 and December 10, 2001, and a Special Meeting of the ACIC Board of Directors held on January 8, 2002, and there were no discussions at any of these meetings about Mr. Faust deleting email from Mr. Baumgarten's laptop computer. *Id.* at ¶4. To support Jerry Shaw's claims, Plaintiffs submitted William LeVine's August 31, 2005 deposition testimony showing Mr. LeVine, Chairman of the Board, did not know Mr. Faust deleted Mr. Baumgarten's email until the day of his August 31, 2005 deposition. Pls.' Reply, Ex. B, LeVine Dep., p. 57, lines 9-18.

As to Mr. Baumgarten's Palm Pilot, George Hadley, ACIC's Chief Information Officer, filed an affidavit attesting "[t]he Palm was sent to ACIC's counsel in this case in working condition in **January 2005** as part of ACIC's efforts to respond to Plaintiffs' document requests." Def.'s Resp. in Opp'n to Pls.' Mot. to Strike, Ex. E, Hadley Aff. ¶11. However, ACIC claims its counsel reviewed the Palm Pilot's contents in **2005** and determined the contents "did not contain any emails responsive to any document requests and in no way relevant to the lawsuit." ACIC Resp. in Opp'n to Pls.' Mot. to Strike at 16; *see also* Ex. I, Cooper Aff. ¶4-6. ACIC claims the Palm Pilot had been synchronized before Mr. Baumgarten's heart attack and "left untouched

18

thereafter until this lawsuit was filed." *Id.*, Ex. I, Cooper Aff. ¶4.   Thus, ACIC claims the Palm

Pilot "was the best evidence of what emails were on Mr. Baumgarten's hard drive at that time."

*Id.*, Ex. I, Cooper Aff. ¶4.   ACIC claims there were 118 emails, "all of which were personal and

had nothing to do with ACIC's business, or more specifically, Shaw." *Id.,* Ex. I, Cooper Aff. ¶5.

Unfortunately, ACIC claims its attorney, after taking notes regarding the Palm Pilot's contents,

returned the Palm Pilot to its box.  When the Palm Pilot became the subject of discovery, ACIC's

attorney retrieved the Palm Pilot and found  the battery was dead and all the contents were lost.

*Id.*, Ex.I, Cooper Aff. ¶ 6. ACIC claims two computer experts were unable to retrieve the lost

data.  *Id.*  Based on these fact, ACIC asserts the Palm Pilot's contents are consistent with "no

spoliation."

As to the backup tapes, ACIC notes Plaintiffs' experts did not review the back-up tapes.

However, Plaintiffs contend ACIC informed them the back-up tapes did not contain information

from the relevant time frame, so there was no need to review them.

Thus, the evidence indicates Mr. Faust deleted Mr. Baumgarten's email from his laptop

computer shortly after Mr. Baumgarten's heart attack.  Yet, ACIC's pleadings continue to denote

this action as "possibly deleted"  when it is an established fact Mr. Faust deleted the emails.  Even

assuming, arguendo, that ACIC did not have a duty to preserve Mr. Baumgarten's emails because

at that time it could not reasonably foresee litigation between Plaintiffs and ACIC, by **October

22, 2001**, litigation was foreseeable.  On that date, Robert Thomas, ACIC's CEO, recognized the

"escalating dispute between Shaw and ACIC" and, along with Mike Holbrook, Lee Back, and

Frank Lanak, met with Jerry Shaw and **their respective attorneys** to address the dispute.  Having

failed to resolve the issues presented by Jerry Shaw, ACIC knew or should have known  litigation

19

was very probable.  Nonetheless, on **November 2001**, George Hadley reformatted Mr.

Baumgarten's laptop computer.  Prior to the November 2001 reformatting, Plaintiffs' computer

expert opined the deleted emails could have been recovered.  After the second reformatting, in

**May 2004**, the contents of Mr. Baumgarten's hard drive were unrecoverable and only "snippets

of data" were available to Plaintiffs.

In terms of the relevancy of the deleted files from Mr. Baumgarten's laptop computer,

ACIC argues:

> As to the relevancy issue, this court ordered the production of Mr. Baumgarten's hard drive
> and any back up media. (February Order).  The obvious purpose of this order was to allow
> Shaw's computer experts to analyze the hard drive to determine if there was any evidence of
> the type Shaw claims should have existed.  There was none.  Not surprisingly, Shaw argues
> that the lack of any such evidence is solely a result of the deletion by Mr. Faust or the later
> reformatting.  While a convenient argument, it is without support.

ACIC's Resp. in Opp'n to Pls.' Mot. to Strike at 13.  First, the Court finds this argument

ludicrous.  Second, as the Honorable William Johnson noted:

> In order to be relevant to the litigation, the deleted emails need not have been limited to
> correspondence regarding oral modifications of the joint venture between Jerry Shaw and
> Baumgarten.  The material could also be relevant if it has some bearing on that business
> relationship.  In light of the evidence which exists of the animosity Faust held for Shaw and
> his disapproval of the ACIC/Shaw business relationship, this connection could easily be
> inferred.

Third, the "snippets of data" establish that relevant documents were on Mr. Baumgarten's hard

drive <u>prior</u> to the reformattings.  *See* Pls.' Mot. to Strike, Ex. E, Hotchkiss Aff. & Ex. 1-8

attached to Ex. E.

The Court also notes Mr. Hadley attested he "recovered Mr. Baumgarten's computer,

placed the files on a CD" and provided this CD to Mr. Baumgarten's family.  ACIC's Resp. in

20

Opp'n to Pls.' Mot. to Strike, Ex. D, Hadley Aff. ¶ 5.   Mr. Hadley further attested he "attempted

to retrieve the CD from Mr. Baumgarten's family, but they could not locate it."   *Id.*

      Significantly, ACIC claims the Palm Pilot "was the best evidence of what emails were on

Mr. Baumgarten's hard drive at that time."   ACIC Resp. in Opp'n to Pls.' Mot. to Strike at 16.

At the September 14, 2006 hearing, ACIC's counsel stated there was an email regarding a lunch

meeting between Mr. Baumgarten and Jerry Shaw.   Thus, the Palm Pilot contained relevant

documents.   Yet, although ACIC received the Palm Pilot in working order in **January 2005**, it

failed to provide Mr. Baumgarten's Palm Pilot or the documents it contained to Plaintiffs and

unilaterally determined it contained no relevant evidence.   Again, on February 15, 2005, ACIC's

counsel claimed he informed Plaintiffs' counsel "Skip Baumgarten's laptop documents could [not]

be recovered from that computer" but failed to turn over the documents contained in the Palm

Pilot which it had received just the month before.

      The Court views discovery requests with the liberality contemplated by the federal rules.

Discovery is designed to ""[m]ake trial less a game of blind man's buff and more a fair contest

with basic issues and facts disclosed to the fullest possible extent."   *United States v. Proctor and*

*Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986-87 (1958).   Federal courts construe discovery

rules liberally to insure a litigant's right to discovery is broad and flexible.   *Goldman v. Checker*

*Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963)( "Plaintiff was entitled under Rule 34 to have the

documents produced for his inspection, and it was not enough for defendant to submit merely its

own interpretation of the documents.").   Additionally, the concept of liberal discovery is intended

to allow litigants, consistent with recognized privileges, to obtain the fullest possible knowledge

of the issues, facts, claims and defenses before trial.   Broad discovery is calculated to allow the

parties to evaluate the strength or weakness of the case so as to permit settlement or to prepare to meet the proofs at trial. Rule 26(b)(1) states in relevant part:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ....
>
> Relevant information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26. The test of relevancy is significantly broader at the discovery stage, therefore, discovery is permitted as to matters which "[are] or may become relevant," *Payer, Hewitt & Co. v. Bellanca Corp.*, 26 F.R.D. 219, 221 (D.Del.1960), or "might conceivably have a bearing" on the subject matter of the action, *Triangle Mfg. Co. v. Paramount Bag Mfg. Co.*, 35 F.R.D. 540, 542 (E.D.N.Y.1964); *see also E.I. duPont de Nemours & Co. v. Deering Milliken Research Corp.*, 72 F.R.D. 440, 443 (D.Del.1976)( "Unless it is palpable that the evidence sought [to be made subject to discovery] can have no possible bearing upon the issues, the spirit of the new [federal] rules calls for every relevant fact . . . to be brought out for the inspection not only of the opposing party but for the benefit of the court . . . .")(citing *Hercules Powder Co. v. Rohm & Haas Co.*, 3 F.R.D. 302, 304 (D.Del.1943)).

Applying these standards, the Court finds ACIC had a duty to produce the emails/documents contained in Mr. Baumgarten's Palm Pilot in response to Plaintiffs' discovery requests. If ACIC objected to discovery of the contents of Mr. Baumgarten's Palm Pilot, ACIC should have filed its objections and obtained a ruling from the Court.

### 2.  Janus Documents

Specifically, Plaintiffs allege "nearly **eleven months** after Shaw formally requested ACIC to produce the Janus documents, and **eight months** after discovery closed in this case, ACIC <u>still</u> has not produced all Janus documents in compliance with the January 25th Order."  Pls.'s Mot. to Strike at 6 (emphasis in original).  ACIC offered **no explanation** to Plaintiffs' claim that ACIC has failed to produce a bond file for seven bonds other than to assert it has produced two of the seven bond files in question.  *See* Pls.' Ex. A, Bell Aff.¶7.  ACIC also asserted the Court has already ruled on this issue.

The Court is perplexed with ACIC's response that the Court has already ruled on this issue.  ACIC's Resp. at 4, n.2.  Although the Court granted Plaintiffs' Second Application on January 25, 2006 [Doc. No. 98], and ordered ACIC to produce "all non-privileged documents concerning the Janus Corporation that are maintained by its bond underwriting and bond claims department," ACIC has not fully complied with the Court's Order.  January 25, 2006 Mem. Op. and Order at 5.  On February 2, 2006, ACIC produced 900 additional Janus documents.  Apparently, ACIC believes it complied with the Court's January 25, 2006 Memorandum Opinion and Order when it produced these Janus documents.  However, ACIC failed to respond to any of Plaintiffs' concerns regarding ACIC belated production of 1276 Janus documents (376 produced after Plaintiffs filed their August 17, 2005 Second Application) and ACIC's failure to produce the remaining five bond files.

### 3.  Andy Faust's Hard Drive

ACIC contends Plaintiffs are "continuing to perpetuate the discovery abuse myth" and "attempting to add fuel to the fire by seeking sanctions for the loss of Andy Faust's hard drive . . .

."  Def.'s Resp. in Opp'n to Pls.' Mot. to Strike at 7.  ACIC admits it "was unable to locate Mr.

Faust's hard drive."  *Id.*  In an attempt to explain how it lost Mr. Faust's hard drive, ACIC claims:

> After Mr. Faust resigned in February 2003, his desk top computer sat on his desk untouched for approximately 2 months.  It was then removed and stored in the PC tech room.  *Id.*  The hard drive was labeled with a yellow Post-It note that read, "A.F. HD."  The storage room where Mr. Faust's hard drive was kept, however, was moved three times after Mr. Faust's departure.  Ultimately, no hard drive among the 32 stored in the PC tech room was found with this Post-it note still affixed to it.  Thus, on February 6, 2006, in preparation for compliance with this Court's Order, all 32 hard drives stored in the PC tech room were installed into a computer and searched in an attempt to locate Mr. Faust's hard drive.

Def.'s Resp. in Opp'n to Pls.' Mot. to Strike at 7, n.7 (citations to Hadley Aff. omitted).  ACIC

then argues "Its inability to comply, however, does not satisfy a Rule 37 dismissal or its

equivalent."  By his own admission, Mr. Faust claimed to have authored "tens of thousands of

memos."  Pls.' Resp. to Def.'s Mot. for Summ. J., Ex. G, Faust Dep., p. 79, line 13.  This is not

surprising considering his long tenure at ACIC.  However, Plaintiffs "can find no documents that

appear to have been produced from Faust's computer."  Pls.' Mot. to Strike at 3.  Significantly,

Faust's August 22, 2001 letter (Pls.' Mot. to Strike, Ex. G), his December 9, 2000 memorandum

to Skip Baumgarten and Mike Holbrook (Pls.' Mot. to Strike, Ex. J), and his September 24, 2001

memorandum to Corby Baumgarten (Pls.' Third Application, Ex. F) establish Plaintiffs were

denied relevant evidence.  Remarkably, ACIC failed to produce Faust's September 24, 2001

memorandum and his August 22, 2001 letter.  Plaintiffs procured these documents through other

sources.

    The Court finds it particularly disturbing that ACIC did not preserve Mr. Baumgarten's

hard drive or his Palm Pilot and simply lost Mr. Faust's hard drive.  The Court also finds it rather

peculiar that ACIC would not keep a copy of Mr. Baumgarten's files for its records since he was

the "benevolent dictator" (as Mr. Holbrook described him) who controlled ACIC.  Equally peculiar is the fact Mr. Baumgarten's family also managed to lose the CD of all of Mr. Baumgarten's  files Mr. Hadley provided.  Moreover, ACIC had the opportunity as late as 2005 to provide Plaintiffs with Mr. Baumgarten's email when ACIC had possession of Mr. Baumgarten's Palm Pilot.  Mysteriously, the Palm Pilot endured intact from 2001 to 2005 yet managed to self-destruct when in the possession of ACIC's attorneys.

The Court also notes ACIC's lack of candor with Plaintiffs and the Court.  In response to Plaintiffs' discovery requests, ACIC repeatedly represented to Plaintiffs and to the Court that the production of hard drives was unnecessary because it had produced all relevant documents from its key management, specifically Mr. Baumgarten and Mr. Faust.  At the time ACIC's counsel made these representations, ACIC knew Mr. Baumgarten's hard drive had been reformatted twice.  It was not until the Court ordered ACIC to produce Mr. Baumgarten's hard drive that ACIC finally disclosed the hard drive had been reformatted a second time in May 2004. Moreover, either ACIC's counsel failed to inspect Faust's hard drive and falsely represented he had or counsel knew Mr. Faust's computer was lost and failed to disclose this fact to Plaintiffs and to the Court.  Based on the inordinate amount of relevant and potentially relevant evidence lost to Plaintiffs from the two most significant individuals in the case, i.e., ACIC's CEO and its President, and ACIC's cavalier attitude, the Court finds willful spoliation and bad faith in this case.

**B.  Degree of Actual Prejudice to Plaintiffs**

Plaintiffs contend they were prejudiced by Mr. Faust's deletion of Mr. Baumgarten's email, by the two reformattings of Mr. Baumgarten's laptop computer, by the loss of the contents in Mr. Baumgarten's Palm Pilot, by the loss of Mr. Faust's hard drive, and by ACIC's failure to produce all the Janus files.

The Court found in its February 1, 2006 Memorandum Opinion and Order that ACIC's reformatting of Mr. Baumgarten's hard drive was prejudicial to Plaintiffs.  Mem. Op. and Order at 13.  The loss of the contents in Mr. Baumgarten's Palm Pilot also prejudiced Plaintiffs.  The Court also finds the loss of Mr. Faust's hard drive prejudicial to Plaintiffs.  To reiterate, as CEO and President, respectively, Mr. Baumgarten and Mr. Faust were critical to ACIC's management. They are the "key players" in this case.  It was Mr. Baumgarten, as ACIC's CEO, and Jerry Shaw that knew about the "various oral modifications" to the Agreements which are the subject of this lawsuit, and it was Mr. Baumgarten that dealt exclusively with Jerry Shaw.   The contents of his hard drive were significant and critical to Plaintiffs.

As to Mr. Faust's hard drive, Plaintiffs allege in their Second Amended Complaint that Mr. Faust took action against Plaintiffs shortly after Mr. Baumgarten's heart attack.  It is Mr. Faust Plaintiffs contend destroyed the Shaw/ACIC relationship and caused the demise of Jerry Shaw's business.   In their Second Amended Complaint Plaintiffs enumerated several actions taken by Mr. Faust to undermine the Shaw/ACIC relationship.  See Pls.' Second Amended Comp. ¶16.  In proving these claims, the contents of Mr. Faust's hard drive were critical to Plaintiffs. Consequently, the Court finds that Plaintiffs were prejudiced by the loss of Mr. Faust's hard drive.

Plaintiffs also contend they were prejudiced by ACIC actions regarding the Janus documents because Janus is Plaintiffs' most important customer at issue in this case and ACIC's handling of the Janus account is illustrative of ACIC's tortious conduct which destroyed the Shaw/ACIC relationship.  Pls.' Mot to Strike at 13.  To support their contention, Plaintiffs contend Janet Shaw, Jerry Shaw's daughter and an ACIC employed responsible for handling all of Plaintiffs' agency business, submitted a $7 million bond request to Swiss Re,  ACIC's reinsurer, for its special acceptance on June 23, 2001.  *See* Pls.' Ex. F to Pls.' Mot. to Strike.  However, shortly after Mr. Baumgarten's heart attack, Mr. Faust unilaterally withdrew the request from the reinsurer without advising Janet Shaw or any representative from Shaw and Associates, Inc. or Jerry Shaw and Associates, Inc.  Later, Mr. Faust defended his actions by stating, "all I did with Jerry on his $7+ million bid bond request was ask him for information regarding the accounts footnote to his contractors financial statement about lawsuits in process."  *See* Pls.' Mot. to Strike, Ex. G.[6]   However, after ACIC belatedly produced a Janus document on September 28, 2005, Plaintiffs discovered Mr. Faust had not disclosed the actual reason for declining Plaintiffs' $7 million bond request.  The document indicates there were "no claims or suits pending."  *See*

---

[6] Plaintiffs point out this statement was in a **three page memorandum authored by Mr. Faust, dated August 22, 2001**, and addressed to ACIC's lead director Bill LeVine, Corby Baumgarten, Skip Baumgarten's wife, and Ron Baumgarten, Skip Baumgarten's brother.  Mr. Faust, Corby Baumgarten, and Mr. LeVine comprised the three-person Executive Committee responsible for administering ACIC in Skip Baumgarten's absence.  **The August 22, 2001 Faust memorandum was never produced by ACIC.**  Mr. Faust produced it on the morning of his deposition.  Significantly, Mr.Faust provided his personal file along with a handwritten note dated September 15, 2002, and addressed to Bob Thomas, ACIC's current CEO.  The handwritten note to Mr. Thomas stated: "Here is a personal file which is some disjointed correspondence about some things, please look over if you like and return to me, feel free to copy anything you like." Pls.' Ex. I.  Plaintiffs contend Mr. Thomas and ACIC failed to produce or mention the Faust memorandum, Mr. Faust's personal file or any documents it may have contained.  Pls.' Mot. to Strike at 13.

Pls.' Mot. to Strike, Ex. H.  Nonetheless, Mr. Faust required collateral and declined the request

on this basis.  *Id.*  Plaintiffs claim Mr. Faust did not inform Jerry Shaw about his demand "that as

a condition of approving further Janus bonds, Mr. Faust would require collateral in the form of a

mortgage on Janus's owner's home, a condition that had never been a condition on any Janus

bond."  Pls.' Mot. to Strike at 13.

Therefore, Plaintiffs argue the Janus documents are of great importance because they

relate to one of Plaintiffs' key claim– "that Faust sought to impose arbitrary and unreasonable

underwriting requirements after Mr. Baumgarten's heart attack and that he unilaterally withdrew

the Janus bond request, in his efforts to destroy the Shaw relationship with ACIC."  *Id.* at 14.

Plaintiffs further argue they were not able to effectively question Mr. Faust at his deposition on

this critical issue and could not impeach Mr. Faust's version of the facts because ACIC produced

the document showing the true basis for Mr. Faust declining the $7 million Janus bond until after

discovery had closed.

Based on the foregoing, the Court finds the belated production of the Janus documents

and the inexplicable failure of ACIC to produce the missing 5 bond files also prejudiced Plaintiffs.

## C.  Proposed Sanctions

The Court recommends the following sanctions:

1)  Dismissal of ACIC's counterclaim;

2)  Adverse inference instruction;

3)  ACIC pay all the fees for Plaintiffs' computer expert(s);

4)  ACIC produce the computer hard drives assigned to Mike Holbrook, Lee Back, Bob

Thomas, and Bill Levine for inspection and examination by appropriate experts;

28

5)  Discovery be reopened at ACIC's expense to allow Plaintiffs to depose Mr. Faust and conduct any additional discovery;

6)  Attorneys Fees be granted to Plaintiffs for their Third Application for an Order Compelling Discovery from Defendant American Contractors Indemnity Company and for Sanctions [Doc. No. 105] and their Motion to Strike Defendants Answer and Counterclaim and for Entry of Default, or in the Alternative, for Establishment of Certain Facts and Other Sanctions [Doc. 182].

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**